**Michael and Madeline ROSENBERG**

v.

**The UNITED STATES.**

**No. 320–80T.**

United States Claims Court.

Sept. 16, 1983.

Harold R. Burnstein, Chicago, Ill., for plaintiffs.

Jay G. Philpott, Jr., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant; Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D.C., of counsel.

## OPINION [*]

PHILIP R. MILLER, Judge:

This is a suit for refund of income taxes and interest in the sum of $142,146 paid by plaintiff [1] as a result of a deficiency assessment for the year 1973. The assessment was based on the determination by the Commission of Internal Revenue that plaintiff had received from the M.S. Kaplan Company an unreported dividend of the entire stock of a wholly owned subsidiary, the Chicago Metals Corporation, which the Commissioner valued at $225,000. The Kaplan Company having earnings and profits in excess of $225,000 and plaintiff being a stockholder of the Kaplan Company, *albeit* only a one percent stockholder, plaintiff concedes that he did receive a dividend but contends that its value was zero. The evidence in the record pertinent to the resolution of the valuation controversy follows.

---

[*] Because all facts deemed pertinent are set forth in this opinion, pursuant to Rule 52(a) no separate findings are being filed.

[1] The suit is brought jointly by Michael and Madeline Rosenberg, husband and wife, because they filed a joint tax return. But since all pertinent events relate only to Michael, the term plaintiff will be used herein in the singular to refer to him alone.

Chicago Metals was engaged in the purchase, processing and sale of scrap metals and in the purchase and sale of secondhand machinery useful in the scrap metals business from 1964 to 1973. Immediately prior to 1973 its stock was owned to the extent of 25 percent by the Kaplan Company and 75 percent by plaintiff and his father jointly. The stock of the Kaplan Company was owned mostly by plaintiffs first cousin, Laurence Kaplan, its president, and it too was in the scrap metals business, although it dealt in different kinds.

For the 5 years 1968, through 1972, Chicago Metals had losses averaging $285,000 per year. On or about January 4, 1973, plaintiff and his father jointly sold the remaining 75 percent of its stock to the Kaplan Company in return for the latter's guarantee of a $937,500 bank loan owed by Chicago Metals and on condition that plaintiff pay or settle additional Chicago Metals debts of $545,293. For the next 5 months, Chicago Metals operated as a subsidiary of the Kaplan Company. However, for reasons not explained in the record, the Kaplan Company proved completely unable to operate Chicago Metals successfully, and for the 5-month period from January 4 through May 31, 1973, Chicago Metals reported losses of $930,388.96.

On May 3, 1973, Laurence Kaplan wrote to plaintiff that he had become convinced that the Kaplan Company could not make Chicago Metals profitable and that the Kaplan Company must relieve itself of Chicago Metals as promptly as possible. He offered plaintiff the Chicago Metals stock plus $125,000 in Chicago Metals' notes held by the Kaplan Company and agreed to pay off the $937,500 bank loan which the Kaplan Company had guaranteed, in return for plaintiff liquidating Chicago Metals and paying off its trade creditors with the proceeds. Plaintiff accepted the offer, but obtained a modification of the agreement so as to allow him to make any disposition of the Chicago Metals physical assets he chose as long as he guaranteed to pay off the trade creditors in full.

Plaintiff had no intention to liquidate the business of Chicago Metals. He intended rather to continue to operate it in another form. The transfer of all of the Chicago Metals stock to plaintiff took place between May 6 and 31, 1973. Thereupon, he formed a new corporation, Chimet, and transferred to it all of the Chicago Metals assets and remaining liabilities as of May 31, 1973.

Immediately before the transfer of the Chicago Metals' stock to plaintiff that company was in severe financial difficulty and its survivability as a going concern was in doubt; but upon the elimination of the bank debt paid off by the Kaplan Company and the Kaplan Company's assignment to plaintiff of the $125,000 in Chicago Metals' notes, the latter's assets had a book value of $1,325,982.73, while its remaining liabilities were only $916,802.88 leaving net assets of $409,179.85. With this as an initial investment, plaintiff believed that he could operate the business in the new corporate identity of Chimet so as to warrant its indefinite continuation on a more profitable basis.

On the books of account of Chimet as of June 1, 1973, plaintiff recorded its total purchase price for the assets received from Chicago Metals as the equivalent of the trade liabilities assumed by Chimet, i.e., $916,802.88. He then allocated that value among all of the assets. Subsequently, however, apparently plaintiff discovered Chicago Metals had $39,796.10 in additional liability for unrecorded real estate tax. Pursuant to the same theory he had previously followed, on December 1, 1973, plaintiff increased the purchase price of the Chimet assets by $39,796.10, to $956,598.98, allocating the entire $39,796.10 increase to machinery and equipment.

Section 301(a) of the Internal Revenue Code provides that the amount of a corporate distribution of property to an individual shareholder is the fair market value of such property. Since the income tax regulations do not define fair market value in the context of a dividend of stock of a closely held corporation, defendant cites the definitions from the Treasury Regulations on Gift Tax for such purpose. Section 25.-

2512–1 first sets out the standard definition that the fair market value of property is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." It adds that such value is "not the price that a forced sale of the property would produce" but the price in a market in which such property is commonly sold. Section 25.2512–2 deals specifically with the value of stocks and bonds. Subsection (b) states that if there is a market for the stock, the fair market value is ordinarily the mean selling price on the valuation date. Subsection (f) then states that where selling prices or bid and asked prices are unavailable, other relevant factors should be considered, including the company's net worth, earning power, goodwill, economic outlook in the industry, the degree of control of the company represented by the block of stock to be valued, and the values of stock of corporations engaged in similar businesses which are actively traded on an exchange. Section 25.2512–3 provides where the property to be valued is an interest in a business, relevant factors include a fair appraisal of the assets, earning capacity and goodwill, in addition to factors which are applicable to the valuation of corporate stock.

A case which illustrates an approved method of valuation of an interest in a small business, the stock of which is not traded on an exchange and for which there is no stock of a comparable corporation which is so traded, is *Rothgery v. United States,* 201 Ct.Cl. 183, 475 F.2d 591 (1973). At issue there was the valuation for estate tax purpose of 50 percent of the stock of an automobile dealership, the remaining 50 percent being owned by the decedent's son. On the basis of testimony by expert witnesses the court found that "the evidence in the record shows that the value of an automobile dealership, such as the corporation, is closely related—and generally corresponds—to the value of its underlying assets." (201 Ct.Cl. at 188, 475 F.2d at 594.) It reviewed the book values and appraisals

by expert witnesses of sixteen separate groups of assets owned by the corporation and made specific findings as to the value of each. From the total it subtracted the amount of the corporate liabilities to determine the net worth. It then allocated the net worth among the corporation's 250 shares of stock and multiplied the per share value by the decedent's 125 shares. The court responded to the plaintiff's argument that the value of the 50 percent stock interest so determined should be reduced because of the lack of a market for the stock by finding that the decedent's son would have been a willing buyer, since the evidence in the record showed that the son intended to continue the business after his father's death, and that, if the decedent's stock had been placed on the market for sale, he would have been justified in paying for it half the value of the assets.

In *Fehrs v. United States,* 223 Ct.Cl. 488, 620 F.2d 255 (1980), a case which involved the question of whether or not an exchange of stock of a closely held corporation for an annuity was to the extent of the greater value of the stock a taxable gift, the court again accepted the valuation of the corporation's underlying assets as the measure of the valuation of the stock, which had no actual market. As in the instant case, because the corporation had no significant earnings, the court valued the assets at what they would produce upon liquidation within a relatively short time, i.e., over a period of 2 to 3 months. (223 Ct.Cl. at 511, 620 F.2d at 267.)

The Commissioner valued the dividend of the Chicago Metals' stock received by plaintiff from the Kaplan Company at the value of its assets less the liabilities assumed by plaintiff. In so doing, the Commissioner accepted plaintiff's allocated values on the books of Chimet, the company which received the assets—except for the inventory of scrap metals and the machinery and equipment used in carrying on the business. Although plaintiff's counsel stated he does not agree that Rosenberg's allocated values of items accepted by the Commissioner are their fair market values, he has not offered

proof to the contrary. The controversy thus focuses primarily on the values of the inventory and the machinery and equipment.

On its books of account, Chicago Metals had maintained its scrap metals inventory values at the lower of its cost or market value, using a first-in, first-out method of accounting for dispositions. On that basis, as of May 1, 1973, the Chicago Metals' books reflected a total scrap metal inventory value of at least $275,518.17. However, on Chimet's books, plaintiff allocated only $110,207.27 to the value of its scrap metals inventory, which represented precisely 40 percent of the lower of cost to Chicago Metals or market value. The Commissioner refused to accept such reduction and valued the inventory at the original $275,518.17.

On the books of Chicago Metals its machinery and equipment at cost less depreciation was last valued at $189,094.29. However, on its books Chimet originally allocated only $65,101.71, representing about 34 percent of its predecessor's values, to such machinery and equipment; but, as already noted, on December 1, 1973, it increased that figure by $39,796.10, to $104,897.81, for reasons unrelated to any increase in their actual values. The Commissioner allowed a reduction in the value of such property, but only to the extent of $24,605.29, on the basis of information provided by the plaintiff to the auditing revenue agent; and he, therefore, valued the machinery and equipment at $164,489.

■ In a suit for refund of federal income taxes, the taxpayer bears the burden of proving that he has overpaid his taxes. This means that not only must he establish that the assessment was erroneous, but also the amount which is correct. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976), *Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *E.I. DuPont De Nemours v. United States*, 221 Ct.Cl. 333, 350, 608 F.2d 445, 454 (1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Dysart v. United States*, 169 Ct.Cl. 276, 340 F.2d 624 (1965).

Plaintiff chose to attempt to carry that burden largely by his own testimony.

Plaintiff testified that to his recollection the scrap metals inventory as of the time he turned it over to Chimet consisted of 1.2 to 1.3 million pounds. White metals (unprocessed aluminum, zinc and stainless steel) represented about 50 percent and had a market value of $.06 per pound. Mixed metals (all other unprocessed non-ferrous metals) represented about 40 percent and had a market value of about $.10 per pound. All other non-ferrous metals in a final finished state represented 10 percent and had a market value of $.30 per pound. Since the computed average value was about $.10 per pound, he estimated that the total fair market value of such inventory was between $120,000 and $130,000. He then reduced such value by 50 percent to cover the cost of liquidation of such inventory.

■ However, plaintiff's testimony in regard to the value of the scrap metals inventory is unpersuasive for several reasons:

(1) Plaintiff produced no records of any kind to support his testimony, nor did he account for their absence.

(2) Plaintiff produced no other witnesses to corroborate his testimony, nor did he account for his failure to produce them.[2]

(3) Plaintiff produced no independent appraiser to testify as to the fair market value of the scrap metals, nor did he account for his failure to produce one.[3]

(4) Plaintiff neither explained nor produced any other evidence to explain or

2. Possible witnesses might have included employees of Chicago Metals and Chimet, Laurence Kaplan, president of the Kaplan Co., Harold S. Brady and Ben Schwartz, who became stockholders in Chimet, and the accountants who audited Chicago Metals and Chimet's records.

3. The amount at issue, $142,146, does not appear so insignificant as not to warrant the expense of retaining an independent appraiser to value the entire company or the assets in dispute.

reconcile the differences between the $275,518 value at which Chicago Metals carried the scrap metals inventory on its books of account and the $120,000 to $130,000 value for the same items to which he testified. As previously noted the scrap metals inventory was carried at the lower of cost or market value. This means that it was already recorded at no higher than market value. Furthermore, purchases and sales were recorded on the first-in, first-out method of accounting. This means that the recorded cost for the remaining inventory was already at the most recent prices. In his testimony, Rosenberg attributed to the 1.2 to 1.3 million pounds, of which he had only a visual recollection, an average market value (on other than a liquidation sale) of $.10 per pound. However, a revenue agent's abstract from the company's records reflected that there were 1,343,567 pounds of non-ferrous scrap metals on hand on May 31, 1973, but no breakdown of the physical inventory according to the types of scrap metals. Dividing the $275,518 book value by the total poundage results in a $.205 average cost per pound rather than $.10.

(5) Plaintiff neither explained nor produced any witnesses to explain or reconcile the difference between the $.10 per pound average value for the scrap metals to which Rosenberg testified and the much higher contemporaneously published market prices for similar scrap metals. An abstract of published non-ferrous scrap dealers' buying prices as of May 2 and June 6, 1973, prepared by an Internal Revenue Service financial analyst, from the American Metal Market periodical for 1973, which was admitted in evidence without objection, reflects average dealers' buying prices for different groups of scrap metals ranging from $.2606 to $.3352 per pound in a rising market. While the absence of records showing the actual physical breakdown of plaintiff's inventory precludes the use of the published data to make a precise valuation, it does raise further doubts as to the weight to be accorded plaintiff's unsupported generalized testimony.

(6) Plaintiff's opinion that his market valuation should be further reduced by 50 percent for the cost or effect of liquidation is also dubious. He furnished no factual predicate for such opinion, and made no comparisons with the published dealer buying prices for such scrap. More important, he wholly ignored the value which could be realized by selling an initial inventory over a relatively short period of time, such as Chimet did, rather than merely liquidating it in a forced sale.

As previously mentioned, as of June 1, 1973, plaintiff reduced the value on Chimet's books of the machinery and equipment received from Chicago Metals from a depreciated cost of $189,094.29 to $65,101.71, representing an allocated portion of its deemed purchase price measured by its assumption of Chicago Metals' remaining liabilities, and subsequently increased such allocated value to $104,897.81 to offset an additional overlooked assumed liability of $39,796.10.

Plaintiff testified that in May 1973 Chicago Metals transferred to Chimet machinery and equipment in the estimated quantities, ages and fair market values set forth below:

| Description | Quantity | Age | Fair Market Value |
|---|---|---|---|
| Load lugger boxes | 100 | 6–8 years | $35,000 – $40,000 |
| Fork lift trucks | 4–5 | 3–12 years | $10,000 |
| Scrap shears | 3–5 | 15 years | $5,000 – $6,000 |
| Baling press | none stated | none stated | $2,000 |
| Crane | 1 | over 15 yrs. | $2,000 |
| Furnace | 1 | none stated | $6,000 – $8,000 |
| Scales | 3 | 7–8 years | $6,000 |
| Air compressors, hand tools, etc. | none stated | none stated | $7,000 – $10,000 |

Thus, according to him, the total fair market value of machinery and equipment was not in excess of $84,000.

However, plaintiff's testimony with respect to the value of the machinery and equipment is equally unconvincing. It was based solely on his personal recollection at the time of trial of the appearance of the equipment almost 10 years earlier. He produced no written record relating to any item of equipment. He recalled nothing of the make of any item or its cost to the company, whether it had been purchased new or used, its remaining useful life, the state of its repair, its cost of reproduction new or the actual contemporaneous sale price of a comparable item. The ages of the various categories was merely a general impression. He had no working papers or other figures which could show how he arrived at his values for any of the items. Furthermore, there was no testimony as to why he could not have produced such equipment records or other evidence corroborative of his testimony, particularly since the machinery and equipment continued to be used in the operations of Chimet. He could not even testify as to how long any of the equipment had been used thereafter by Chimet or, if sold, what it had received. Under the circumstances, it was impossible for the defendant or the court to verify any portion of such data or his opinion as to the values.

Plaintiff's opinion evidence to prove that the assets he received had no value cannot be deemed sufficient by itself to carry his burden of proof, because it is the judgment of an interested party unsupported by objective facts, and because "like any other judgments, those of an expert can be no better than the soundness of the reasons that stand in support of them." *Fehrs v. United States,* 223 Ct.Cl. at 508, 620 F.2d at 265. And *see also Montgomery Coca-Cola Bottling Co. v. United States,* 222 Ct.Cl. 356, 373–74, 615 F.2d 1318, 1327 (1980).

Plaintiff contends that the best evidence that the stock of Chicago Metals had only nominal value in May 1973 may be found in the fact that on July 1, 1973, only 2 months later, two unrelated individuals, Harold S. Brady and Ben Schwartz, subscribed to 50 percent of the stock of the successor corporation, Chimet, for $2,500 each in cash. Counsel argues that this arms length transaction proves that prior to such subscription 100 percent of the stock was worth no more than $5,000.

Actually, the fact of such stock subscription in the abstract tends to prove no material fact. Plaintiff did not call Messrs. Brady and Schwartz to testify, and so the court cannot draw any inference as to how much they knew of the values of the underlying corporate assets. The fact that they were willing to pay $5,000 for half the stock does not indicate their belief that it was not worth more. In the absence of any other evidence it is fair to assume that their primary concern was that the stock was not worth *less* than what they paid for it. Nor can the fair market value of the stock be inferred from Michael Rosenberg's willingness to allow Messrs. Brady and Schwartz to subscribe to half of it for only $5,000 in cash. Rosenberg testified that in addition to the cash Messrs. Brady and Schwartz brought to the business many years' experience and expertise in ferrous and non-ferrous scrap metals purchasing and marketing in Chicago and other middle west areas, which were otherwise unavailable to plaintiff; that they also brought in the services of a third individual who had the experience and prime responsibility for developing a non-ferrous metals brokerage business for Chimet; and that their joint involvement caused the nature of Chimet's business to change dramatically from that of Chicago Metals.

Plaintiff argues that the fact that Chicago Metals had losses averaging $288,000 for each of the 5 years prior to 1973 and a $930,388 loss for the 5-month period ending May 31, 1973, when it operated under Kaplan's aegis, is convincing evidence that the business had no value when Michael Rosenberg received its entire stock in May 1973.

This is a *non sequitur.* The fact that a business has incurred losses does not mean that its assets are valueless. There is no evidence in the record that as of May 1973 no scrap metals business in the Chicago area could be expected to earn any money. Nor did plaintiff offer any testimony to establish that the reasons for the prior losses could be expected to carry over to any successor business. Certain changes were apparent. Scrap metals dealer and wholesale prices had been increasing since the beginning of 1973. The assets which Mr. Rosenberg received were freed of the burden of more than a million dollars in liabilities and interest to which they were subject in Chicago Metals' possession, and, as Mr. Rosenberg testified, "[T]he nature of Chimet's business changed dramatically from what Chicago Metals had done by virtue of the involvement of Mr. Brady and Mr. Schwartz."

Certainly Rosenberg's testimony establishes that in turning over to Chimet the assets he received he expected that Chimet would become a viable profit-making business through their use. That was not an unreasonable expectation is confirmed by the evidence in the record with respect to the results of the first 2 years of Chimet's operations. For its first fiscal year ended May 31, 1974, Chimet's financial report shows a profit of $2,139 before a $3,500 provision for estimated income tax thereon; but the report also states that in arriving at such profit inventories were valued under the last-in, first-out method of accounting, and that if they had been valued under the first-in, first-out method total inventory value (and consequently profits) would have been increased by $512,000. In addition, the same report shows payments or accruals of $84,873 for executive salaries and $17,812 for contributions to a salaried employees' profit sharing trust. For the year ended May 31, 1975, Chimet's financial report shows after tax profits of $48,206, but which would have been increased by $120,000 had it not used last-in, first-out

accounting; and it also shows deductions for executive salaries of $119,668 and contributions of $21,559 to the salaried employees' profit sharing trust.

Next, plaintiff argues that because Chicago Metals was a closely held company, in financial difficulty and in a volatile industry, its stock had no fair market value capable of being ascertained with reasonable certainty; and, therefore, even if it had value, its receipt should not be taxed to Mr. Rosenberg in 1973, but should be deferred until he disposed of the stock of Chimet in a later year. This is the "open transaction" theory urged by taxpayers in a number of cases when they desired to convert ordinary income into a capital receipt or capital gain. Where the Internal Revenue Code has specifically imposed a tax on the receipt of property, as here,[4] except in rare and extraordinary cases, the open transaction theory has generally been rejected in favor of the best estimate of fair market value which the circumstances allow. *See Campbell v. United States,* 228 Ct.Cl. 661, 670–71, 661 F.2d 209, 215 (1981); *Estate of Bird v. United States,* 534 F.2d 1214, 1218 (6th Cir. 1976); *McCormac v. United States,* 191 Ct.Cl. 483, 424 F.2d 607 (1970); *Denver & Rio Grande Western Railroad v. United States,* 162 Ct.Cl. 1, 318 F.2d 922 (1963); *Grill v. United States,* 157 Ct.Cl. 804, 303 F.2d 922 (1962); and *Garvey, Inc. v. United States,* 1 Cl.Ct. 108, 123 (1983). It is apparent that what plaintiff received here was the underlying assets of Chicago Metals less the trade liabilities and accrued real estate taxes, and it is no more difficult to value them than to value the business assets in the above cited cases or any other small business.

Although the defendant also produced a single witness, an Internal Revenue Service financial analyst, to testify as to the values of the inventory and machinery and equipment, his opinion testimony added little of

---

**4.** Internal Revenue Code §§ 301(a) and (c)(1).

significance to the record. He testified that in his opinion plaintiff could have liquidated the inventory of scrap metals to a willing buyer or buyers within 4 to 6 months after its receipt at the $275,518 book value less a 15 percent discount. He based such opinion on the fact that the value of the metals was already maintained on the books at the lower of cost or market value and on the average published dealer and wholesale prices for scrap metals from American Metal Markets, which were reasonably close to book value. However, he had no personal familiarity with the scrap metals business, he had never seen the inventory in question and he had no knowledge of the exact composition and state of the inventory. The basis for his opinion as to the value of the machinery and equipment was stated in his report to be merely that:

> The book value for machinery and equipment was $189,094.00 net accumulated depreciation. During the course of the audit the revenue agent approved a write down of the machinery and equipment account to $164,489.00 based on information provided by the taxpayer. The findings of this examination will be relied upon as the best evidence of value in the absence of any substantiated value to the contrary.

From this he also subtracted the 15 percent discount.

The basis for his opinion as to the 15 percent discount was merely that it was necessary to reflect the costs associated with liquidating the assets of the firm.[5]

In sum the presentations by both sides leaves much to be desired. But since under the applicable rule of law the plaintiff had the burden of proving that the Commissioner's determination was erroneous and the extent to which plaintiff overpaid his taxes, the onus of such inadequacies falls on plaintiff. Nevertheless, plaintiff is entitled to the benefit of defendant's concession that in determining fair market value it was proper to apply "a 15 percent across-the-board discount to reflect the costs of liquidating [Chicago Metals]." Since the Commissioner's determination made no such allowance, it is applied as follows to the plaintiff's assets to be liquidated:

Assets and Liabilities Transferred to Michael Rosenberg at Net Values Determined by Commissioner, with Asterisks Marking Tangible Assets

| Assets | Net Values |
| --- | --- |
| Cash | $ 4,625 |
| Exchange Checks | 1,853 |
| Accounts Receivable | 35,000 |
| Accounts Receivable – Trade | 324,983 |
| Misc. – Receivables | 500 |
| Personal Deposits | 805 |
| * Inventory – Metal | 275,518 |
| * Inventory – Used Machinery | 60,000 |
| Prepaid Expenses | 5,101 |
| Prepaid Rent | 991 |
| Prepaid Insurance | 15,979 |
| Prepaid Truck License | 1,353 |
| Cash Surrender Value | 255,666 |
| * Machinery & Equipment | 164,589 |
| * Motor Equipment | 8,183 |
| * Office Equipment | 2,500 |
| Leasehold | 950 |
| * M. & E. Baler Located in Binghamton | 23,000 |
| Total Assets | $1,181,596 |
| Total Liabilities | 956,599 |
| Net Equity | 224,997 |

Since the tangible assets total $533,790, the additional 15 percent cost of their liquidation would have been $80,068. In addition, any buyer of the entire business would have had to liquidate the trade accounts receivable over a period of time with some expense and the possibility of some loss due to bad debts. It is therefore reasonable to infer that defendant's concession of a 15 percent liquidation discount applies equally to the $324,983 in such receivables too. Such discount amounts to $48,747. The total discount is therefore $128,815. Accordingly, it is now determined that the fair market value of the dividend received by plaintiff from the Kaplan Company is $96,185 rather than the $225,000 determined by the Commissioner of Internal Revenue.

Plaintiff is entitled to recover in accordance with this opinion. Determination of the amount of recovery is reserved for further proceedings. If the parties do not file a stipulation for judgment within 30 days, plaintiff is directed to file a motion request-

---

**5.** Unaccountably and perhaps inadvertently the witness applied the discount to the excess of assets over liabilities rather than to the value of the assets to be liquidated.

ing such further proceedings and setting forth the precise nature thereof.