**168**

Sharon DAVIS, Administrator of the
Estate of Joseph A. Davis,
Petitioner,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 89–18V.

United States Claims Court.

April 16, 1990.

Clifford J. Shoemaker, Vienna, Va., for petitioner.

David L. Terzian, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

OPINION [1]

NETTESHEIM, Judge.

In this action under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1—300aa–23 (Supp. V. 1987), *as amended* by several public laws codified in 42 U.S.C.A. §§ 300aa–1—300aa–23 (West Supp.1989) ("the Act"), Sharon Davis, administrator of her deceased infant's son estate, seeks compensation for the death of Joseph ("Joey") A. Davis. In a Report and Recommendation filed on October 3, 1989, Special Master Elizabeth E. Wright recommended that the Claims Court enter judgment on behalf of the decedent's estate, awarding $250,000.00 in compensation and $30,000.00 in attorneys' fees and costs. Respondent filed objections to that recommendation on October 23, 1989, and argued that a report titled "VICP [Vaccine Injury Compensation Program] Medical Review" established by a preponderance of the evidence that Joey Davis' death was caused by factors unrelated to the administration of the diphtheria-pertussis-tetanus ("DPT") vaccine. By order of December 5, 1989, this court directed the Special Master to conduct further proceedings, pursuant to Vaccine Rule 19(c)(2), and make inquiry into the alternate etiology set forth in the VICP Medical Review. *Davis v. Secretary,* 19 Cl.Ct. 134, 144 (1989). Two hearings were held, and on the basis of the prior record and the supplemental evidence, the

---

**1.** This order may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (Supp. V 1987). Accordingly, within 14 days of the date of filing this opinion, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If on review of this opinion, there are no objections filed within the 14–day period, then it shall be deemed that there is no material subject to section 300aa–12.

Special Master again concluded that respondent had not shown by a preponderance of the evidence that Joey's death was a result of factors unrelated to the administration of the DPT vaccine. *Davis v. Secretary,* No. 89–18V (Cl.Ct.Spec. Master Jan. 30, 1990). Respondent again noted its objections, and argument has been held.

## FACTS

The following facts derive from a *de novo* review. Since the issue whether respondent has proved alternate causation was not considered sufficiently in the first hearing, the determinative facts were developed on remand. On January 5, 1990, the Special Master conducted a hearing and elicited testimony from one of the authors of the VICP Medical Review, Dr. Cynthia G. McCormick. Doctor McCormick received her Doctor of Medicine from the Medical College of Pennsylvania. She completed an internship and residency in the Department of Pediatrics and Communicable Diseases at the University of Michigan Medical Center. Dr. McCormick served for one year as a United Cerebral Palsy Foundation Fellow in the field of child neurology. The fellowship was then followed by a two-year residency in neurology at the Chil-

dren's Hospital of Philadelphia. Dr. McCormick has been certified by the American Board of Pediatrics and the American Board of Psychiatry and Neurology. Since 1988 she has worked as the Chief Medical Officer for the Vaccine Injury Compensation Program.

During the January 5, 1990 hearing, Dr. McCormick posited that Joey Davis was not a healthy child before the onset of the illness that resulted in his death. Dr. McCormick described a child at risk of serious infection. Basing her opinion on the medical records, she asserted that Joey had not been feeding well before his illness and upon admission to the hospital was lighter in weight than a normal healthy baby of the same age. Moreover, Dr. McCormick recounted that Joey's medical records revealed evidence of candida,[2] a positive culture for herpes,[3] and prior episodes of conjunctivitis[4] and otitis media.[5] Respondent's theory, as summarized in the VICP Medical review, is that the infant Joey was infected by a rotavirus, that later caused viral gastroenteritis[6] and that developed into hypovolemic shock.[7] Moreover, according to respondent, Joey's viral gastroenteritis was complicated by a variety of other factors: dehydration, metabolic aci-

2. Candida is "a genus of yeastlike of imperfect fungi of the family Cryptococcaceae, order Monilales, characterized by producing yeast cells, mycelia, psuedomycelia, and blastospores. It is commonly part of the normal flora of the skin, mouth, intestinal tract, and vagina, but can cause a variety of infections including candidiasis, onychomycosis, tinea corporis, tinea pedis, vaginitis, and thrush...." *Dorland's Illustrated Medical Dictionary* 262 (27th ed. 1988) [hereinafter *"Dorland's"*].

3. Herpes is "any inflammatory skin disease caused by herpesvirus and characterized by the formation of small vesicles...." *Dorland's* at 759. Precipitating factors for herpes simplex include "fever, exposure to cold temperature or ultraviolet rays, sunburn, cutaneous or mucosal abrasions, emotional stress, and nerve injury...." *Id.*

4. Conjunctivitis is "inflammation of the conjunctiva [delicate membrane that lines the eyelids], generally consisting of conjunctival hyperemia associated with a discharge...." *Dorland's* at 374.

5. Otitis media is "inflammation of the [middle ear, tympantinis] which may be marked by pain, fever, abnormalities of hearing, hearing loss, tinnitus, and vertigo...." *Dorland's* at 1202.

6. Gastroenteritis is "an acute inflammation of the lining of the stomach and intestines, characterized by anorexia, nausea, diarrhea, abdominal pain, and weakness, which has various causes, including food poisoning ... consumption of irritating food or drink; or psychological factors such as anger, stress, and fear...." *Dorland's* at 680.

7. Hypovolemic shock results from "insufficient blood volume for the maintenance of adequate cardiac output, blood pressure and tissue perfusion. Without modification the term refers to absolute hypovolemic shock caused by acute hemorrhage or excessive fluid loss. Relative hypovolemic shock refers to a situation in which the blood volume is normal but insufficient because of widespread vasodilation as in neurogenic shock or septic shock...." *Dorland's* at 1516.

dosis,[8] disseminated intravascular coagulation ("DIC"), and ultimately multiple organ system failure.

Respondent's theory is that Joey's death was the result of a rotavirus inspired "sepsis." Sepsis, as defined by Doctor McCormick, is "an overwhelming infection that affects basically all aspects of the body...." In support of that theory, Dr. McCormick made a number of arguments: Rotavirus infections are commonly found among infants and occur most frequently during the winter season. A stool specimen taken from Joey during his hospital stay was analyzed according to the Rotazyme assay process and tested positive for the rotavirus antigen.[9] Joey suffered from hemolysis [10] and a peripheral blood smear indicated the presence of Dohlebodies.[11] These facts, in addition to DIC, suggested to Dr. McCormick that Joey was septic and that the sepsis had affected all aspects of his body.

Dr. McCormick dismissed petitioner's theory that the DPT vaccine caused Joey to suffer endotoxic shock. She asserted that there is no evidence that either the DPT vaccine causes endotoxic shock in humans or that severe effects like those in this case can be correlated with high endotoxin levels in a particular dose of the vaccine. Moreover, Dr. McCormick testified that "when a child has a gram negative substance due to bacteria" endotoxin in the cell wall "can produce the same kind of picture...."

On cross-examination, Dr. McCormick made two concessions. First, Dr. McCormick admitted that she did not know of a prior case of viral sepsis where the symptoms of encephalopathy (such as lethargy and unarousability) occurred before the on-

set of diarrhea. Second, Dr. McCormick agreed that Joey, unlike 96 percent of rotavirus cases, did not vomit. Dr. McCormick contended that the order in which Joey's encephalopathic symptoms and diarrhea occurred was unclear—theorizing that the diarrhea may have appeared first, but went undetected. As to the second point, the doctor asserted that two-month-old children do not vomit.

On January 18, 1990, the Special Master allowed petitioner to bring forward testimony from her expert, Dr. Martin Goldfield, as to respondent's theory of alternate causation. Dr. Goldfield received his Doctor of Medicine from Boston University, completed his internship at the Presbyterian Hospital in Chicago and served as a resident at Massachusetts Memorial Hospital. In addition to a one-year fellowship with the National Foundation for Infantile Paralysis, he has held posts at the New Jersey Department of Health's Division of Laboratories and a number of academic appointments relating to the epidemiology of infectious disease. Board certified in medical microbiology and a member of the Academy of Microbiology, Dr. Goldfield has served as an oral examiner for the certification of other doctors in the fields of medical and public health microbiology.

Dr. Goldfield attacked the basis for respondent's conclusion that viral sepsis was the cause of Joey's death and the conclusion itself. Dr. Goldfield testified that there was considerable reason to doubt that Joey was infected with the rotavirus and that it was "unlikely" that it played a role in his death. In his view there was sufficient reason to question the accuracy of the Rotazyme analysis that revealed the rotavirus. Dr. Goldfield produced two arti-

---

**8.** Metabolic acidosis is "a disturbance in which the acid-base status of the body shifts toward the acid side because of a loss of base or retention of noncarbonic, or fixed (nonvolatile), acids...." *Dorland's* at 17.

**9.** The medical records indicate the "Rotazyme" enzyme-linked immonosorbent assay test was used upon Joey Davis' stool.

**10.** Dr. McCormick defined hemolysis as the "breaking up of red blood cells...."

**11.** Dohlebodies are "discrete, round or oval, blue-staining inclusions seen in the periphery of the cytoplasm of neutrophils, consisting mainly of RNA derived from rough endoplasmic reticulum, found in association with many infections, burns, aplastic anemia, uncomplicated pregnancy, and after administration of toxic agents...." *Dorland's* at 221.

cles that described a high rate of false positive tests occurred when the stool samples from neonates were analyzed.[12] Because of the high incidence of false positives, Dr. Goldfield concluded that the better practice is to confirm a finding of the rotavirus antigen with a later electronic microscope analysis of the stool sample.

According to Dr. Goldfield, Joey's symptoms did not have the "clinical features" of rotavirus infection. While Joey did have diarrhea, he did not exhibit either vomiting or a significant fever. Upon admission Joey had both a normal sodium concentration and a normal urine specific gravity. Two facts in particular take Joey's case out of the typical rotavirus profile: Those who die from rotavirus gastroenteritis suffer serious dehydration before death—Joey was only mildly dehydrated. Furthermore, the fact Joey had a "phenomenally high" spinal fluid protein evidenced to Dr. Goldfield an early insult to his nervous system that predated an infection. Lastly, Dr. Goldfield disputed Dr. McCormick's characterization of Joey as an unhealthy child and stated further that if his death had been the result of sepsis the final anatomical diagnosis would have borne this out. Dr. Goldfield concluded: "There is not a single shred of evidence concerning disseminated sepsis."

In her report the Special Master agreed with the conclusions of Dr. Goldfield, finding that

> it strains credulity to conclude that the symptoms of encephalopathy and DIC would have presented *before* any symptoms of ... [rotavirus] infection. If, as Dr. Goldfield suggested, [rotavirus] ... is site specific, it would not appear likely that central nervous system involvement and third space fluid loss would have preceded the diarrhea. Moreover, the absence of significant fever or vomiting would indicate that [rotavirus] ... was not the etiology of Joey's rapid deterioration following the DPT vaccination.

*Davis v. Secretary,* No. 89–18V, slip op. at 24–25 (Cl.Ct. Spec. Master Jan. 30, 1990) (emphasis in original). Additionally, the Special Master found that the medical records did not bear out respondent's contention that sepsis was the result of the rotavirus infection. The reference to "gram negative sepsis," the Special Master found, was to microbiological findings of gram negative bacilli—one component of the DPT vaccine—and not to whether a virus was present. *Id.* at 24 (citing W. Volk & M. Wheeler, *Basic Microbiology* 26, 587 (4th ed. 1980)). On these bases the Special Master again concluded that respondent's alternate etiology was without merit and that the petitioner was entitled to compensation under the Act.

Respondent objected to such a finding, argued that the Special Master had a "lack of a clear understanding of the medical issues," and requested that this court undertake a *de novo* review of the record. Respondent asserts that the Special Master committed error by: mischaracterizing the testimony of its expert, linking "gram negative sepsis" with organisms in the DPT vaccine, failing to account for numerous clinical symptoms consistent with respondent's etiology, and according inordinate weight to an expert whose mistakes betray his testimony as unreliable. To the extent that the Special Master may have committed errors as reflected in her supplemental report, they are not material. The court has engaged in a *de novo* review of the record. 42 U.S.C. § 300aa–12(d)(1). The court's inquiry, as contemplated by the limited remand, however, focused upon whether through testimonial or documentary evidence adduced below respondent has shown by a preponderance of the evidence that Joey's death was due to factors unrelated to the administration of the vaccine. *See* 42 U.S.C. §§ 300aa–12(d)(1), 300aa–13(a)(1)(B). As noted in the court's earlier opinion, it would not be enough for petitioner to show that Joey suffered one of the manifestations listed in the Vaccine Injury Table or that he died within the time

---

**12.** Christie, *False Positive Rotazyme Tests on Faecal Samples from Babies,* Lancet 1028 (Oct. 1983); Krause, *The Unreliability of Rotazyme ELISA Tests in Neonates,* **Journal of Pediatrics 259** (Aug.1983).

specified after administration of the vaccine. To award compensation the court must still determine that a preponderance of the evidence does not indicate an alternate cause of injury. *See Davis v. Secretary,* 19 Cl.Ct. at 139.

## DISCUSSION

At the outset it is worthwhile to note that the etiology of Joey's illness is either a rotavirus infection leading to sepsis and then ultimately to shock or shock arising out of an adverse reaction to the DPT vaccine. Respondent's expert, Dr. McCormick, testified that if the Health Resources and Services Administration's office in charge of the Vaccine Injury Compensation Program did not believe that "viral sepsis" was the etiology of Joey's illness, this case would have been "recommended ... for compensation." Dr. McCormick's admission puts this case and respondent's burden in sharp focus.

The documentary evidence supporting respondent's position is limited. The autopsy performed by Frederick C. Holland, M.D., on the date of Joey's death, noted:

> Immediate Cause of Death: Ischemic necrosis of brain (cerebral cortex and brain stem) with advanced encephalomalacia, probably secondary to hypoxia, *etiology undetermined.*
>
> Contributory Causes: History of gastroenteritis with marked dehydration secondary to third space loss into gut (by history, rotavirus antigen identified by rotazyme assay)....

(Emphasis added.) The history of gastroenteritis Dr. Holland referred to is evidenced by other records of Baptist Medical Center. The Principal Diagnosis made by Baptist Medical Center doctors—defined as the condition "chiefly responsible for occasioning the admission of the patient"—listed rotavirus gastroenteritis. Moreover, Joey's treating physician, James H. McCrory, M.D., concurred in the diagnosis. Dr. McCrory wrote in a medical history prepared by him after Joey's death that his own "Primary Diagnosis" for Joey's illness was rotavirus gastroenteritis. Such references are important to respondent's defense, since the postmortem alone does not link the rotavirus to sepsis and shock. As Dr. McCormick testified, "[A]n autopsy can't really indicate sepsis because what you've got is a person [who is] dead and you have the results and you can presume from the history in the course that it was sepsis."

Petitioner's response in rebuttal was to attack both the finding that Joey had a rotavirus infection immediately preceding his death and then to assert that, even if this were the case, the rotavirus could not have caused the complications suffered by Joey during his hospital stay. The medical literature introduced by petitioner points up the difficulties of correctly diagnosing the rotavirus infection from the stool samples of infants. The Rotazyme assay process relied upon by the hospital to test Joey's stool has, in other settings, resulted in a high number of false positives. In his testimony Dr. Goldfield referred to a set of stool specimens tested by researchers at London's St. Thomas Hospital. Each of the specimens that tested positive under the Rotazyme assay process was later revealed to be "false positive" when subjected to more rigorous tests under an electron microscope. Citing the results of another study published that same year, Dr. Goldfield testified that a set of samples 7 times larger than the St. Thomas Hospital study was again tested by the Rotazyme assay process. Of those that tested positive for rotavirus among this larger group, less than 8 percent of the specimens were "true positives."

Further, petitioner argues that Joey did not display many of the symptoms commonly associated with rotavirus gastroenteritis: significant fever, vomiting, and dehydration. Joey had a 101–degree fever the first day after receiving the DPT vaccine and a body temperature of 99 degrees on the following day. Dr. Goldfield testified that these results could not be classified a significant fever. Moreover, petitioner deems the fact that Joey did not vomit during his hospital stay a significant departure from the typical rotavirus gastroenteritis case. Disagreeing with Dr.

McCormick's assertion that "generally 2 month old children who have gastroenteritis don't vomit," Dr. Goldfield cited a study where 8 out of 11 infected children, who were less than 6 months of age, vomited. Dr. Goldfield explained:

But when we're talking about vomiting I want to make plain we're not talking about one episode of vomiting in these children. The mean frequency of vomiting per day was nine times, varying in range from two to twenty times per day. The duration is a mean of two to six days that they vomit.... [T]his child had absolutely no vomiting.

Lastly, Dr. Goldfield testified that "virtually all" of the children who die as a result of rotavirus infection suffer serious dehydration before death. Yet, Joey did not show signs of significant fluid loss. The diagnosis that Joey was suffering 10 percent dehydration was, in Dr. Goldfield's opinion, a "guesstimate" based on observation alone. The more accurate measure comes from the chemistries and urine specific gravity tests performed on Joey; those tests show that Joey suffered very little fluid loss.

In reviewing the expert testimony and making a judgment as to the weight to be accorded the opinions of each physician, the court acknowledges that between the two experts Dr. McCormick has had greater clinical experience. It is significant, however, that neither expert was Joey's treating physician; the conclusions each expert has drawn as to the cause of death were derived from the histories and records compiled by other doctors. Thus, the experts meet—more or less—upon equal footing. Moreover, since the statutory presumption of causation benefits petitioner, the Dr. Goldfield's task was more limited than that of Dr. McCormick. Dr. Goldfield was not required to marshal a preponderance of the medical evidence on behalf of petitioner; his task was to point up any infirmities in respondent's position. Even if the court were to assign different weights to the testimony elicited so as to account for differences in professional background, respondent's case is not advanced by according limited weight to Dr. Goldfield's testimony. Respondent still has the laboring oar as to proof of the alternate etiology. The conclusions of its own expert, Dr. McCormick, are only as good as the reasons and evidence that support them; respondent is obliged to make its own case. *See Bunting v. Secretary,* 19 Cl.Ct. 738, 754 (1990) (citing *Fehrs v. United States,* 223 Ct.Cl. 488, 508, 620 F.2d 255, 265 (1980)).

Even if the court accepts Dr. McCormick's view that "there is a significant mortality in the United States...." as a result of rotavirus infection, it is not clear that rotavirus infection caused Joey to become septic and die. If, as Dr. Goldfield suggested, the weight of medical literature describes rotavirus as an infection local to the "gut," respondent's theory that the rotavirus caused infection and distress throughout Joey's body is insubstantial. Had viral sepsis been the cause of death, Dr. Goldfield reasoned that there would be evidence of "inflammatory foci in the body." The record reveals no such evidence.

More troubling are the facts that by the time Joey had arrived at the Jacksonville Naval Hospital, he had a very high protein level in his spinal fluid and had been lethargic and unarousable—familiar symptoms of encephalopathy. The normal protein level in the spinal fluid for an infant his age is 15 to 45 milligrams per 100 milliliters. Joey's spinal protein level upon arrival at the Naval Hospital was approximately 280 milligrams per 100 milliliters. As Dr. Goldfield testified, this unusually high level of protein takes a day or two to develop in the body and is suggestive of an early insult to the brain or nervous system. Moreover, Joey was lethargic and unarousable before his mother and doctors noticed that he had a loose stool. Dr. McCormick theorized that Joey was encephalopathic due to a rotavirus infection that may or may not have yet evidenced itself through diarrhea. As summarized by Dr. McCormick, the failure to change Joey's diaper may explain why the diarrhea went undetected:

It is hard to say from the mother's history whether or not she found him at 8:00 [a.m.] and his diaper was full and that

174

was the onset. I mean, we just don't have that history. I mean, it could have been that he had diarrhea during the night and she didn't change his diaper until the morning. We just don't know.

Respondent cannot rely on the fact that no one may know the order of the symptoms; in establishing the alternate etiology this is appropriately part of its case. This is especially true because, as Dr. McCormick conceded, she does not know of a rotavirus case where encephalopathic symptoms preceded diarrhea. To benefit its case, respondent was required to place the onset of diarrhea before encephalopathy in the chain of events.

Respondent has failed to prove that it is more likely than not that a rotavirus infection in this case led to sepsis, shock and death. Respondent has not shouldered its burden to establish that Joey's death was the result of factors unrelated to the administration of the vaccine.

### CONCLUSION

On the basis of the reports of the Special Master filed on October 3, 1989, and January 30, 1990, and its own review of the record established in the United States Claims Court, 42 U.S.C. § 300aa–12(d)(1), the court finds, pursuant to 42 U.S.C. § 300aa–13(a)(1), that the factual matters required by section 300aa–11(c)(1) have been established by a preponderance of the evidence and that there is not a preponderance of the evidence that the injury was due to factors unrelated to the administration of the vaccine. The court has reviewed the evidence concerning the amount of the separate award for attorneys' fees and costs and finds that the amount is fully substantiated. 42 U.S.C. § 300aa–15(b), (e). All requirements for an award of compensation under the National Vaccine Injury Program have been fulfilled, and petitioner is entitled to a statutory award of $250,000.00 for a vaccine-related injury and an award of $30,000.00 for attorneys' fees and costs. Based on the foregoing,

IT IS ORDERED, as follows:

The Clerk of the Court shall enter judgment for the petitioner in the amount of $280,000.00. Attorneys' fees and costs shall be paid in full as part of the first installment payment.