JOSEPH M. DANIELS, DONOR, AND RUTH P. DANIELS, DONOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daniels v. Commissioner
Docket No. 13453-92
United States Tax Court
T.C. Memo 1994-591; 1994 Tax Ct. Memo LEXIS 599; 68 T.C.M. (CCH) 1310; December 5, 1994, Filed *599 For petitioners: Lawrence H. Weltman, Henry H. Stern, Jr., and Richard B. Walsh, Jr. For respondent: Darrell C. Weaver. SWIFT
SWIFT
MEMORANDUM OPINION SWIFT, Judge: This case is before the Court under Rule 121 on petitioners' motion for summary judgment regarding two issues. Regarding the first issue, respondent agrees that there is no genuine issue of material fact and that the issue is ripe for summary judgment, but respondent contends that summary judgment on this issue should be decided in favor of respondent. Regarding the second issue, respondent opposes petitioners' motion for summary judgment on the grounds that there remain genuine issues of material fact. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent determined deficiencies in petitioners' Federal gift tax for 1982 through 1986 as follows: Joseph M. Daniels' Gift Tax Deficiencies
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) 1982
$ 385,493
--  1983
742,607
$ 185,652
1984
854,150
213,538
1985
848,490
212,123
1986
407,120
--  Ruth P. Daniels' Gift Tax Deficiencies *
Additions to Tax
Year
Deficiency
Sec. 6651(a(1)
1982
$ 385,493
--  1983
338,962
$  84,741
1984
386,645
96,661
1985
408,656
102,164
1986
407,119
--  * Ruth Daniels' gift tax liabilities are
based solely upon the fact that she
consented to the attribution to her of
one half of certain gifts made by
petitioner Joseph M. Daniels.
*600 At the time the petition was filed, petitioners resided in Quincy, Illinois. All references to petitioner in the singular are to Joseph M. Daniels. As indicated, the first issue for decision is ripe for summary judgment and requires the Court to decide whether the exchange by petitioner of common stock of Penn-Daniels, Inc., a closely held family corporation (hereinafter Penn-Daniels) for newly issued Penn-Daniels preferred stock gave rise to a separate and distinct taxable gift of "value" by petitioner to petitioners' children, holders of the Penn-Daniels common stock, and if so, whether such gift was not disclosed on petitioners' 1982 Federal gift tax returns so that the 6-year period of limitation under section 6501(e)(2) would be applicable and respondent's notices of deficiency for 1982 would be timely (1982 statute of limitations issue). The second issue for decision is raised by petitioners' motion for summary judgment and respondent's opposition thereto and requires the Court to decide whether the failure, from 1983 through 1986, of the Penn-Daniels' board of directors to declare, and the failure of Penn-Daniels to pay, dividends on preferred stock held by petitioner, *601 the sole preferred stockholder, give rise to taxable gifts in each year by petitioner to petitioners' children, the holders of the Penn-Daniels common stock (foregone dividends issue). Many of the facts relating to both issues are undisputed. Other relevant facts are supported by affidavits and by other evidence that petitioners have submitted and that is appropriate for consideration in the context of a motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). In the early 1960s, petitioner and a partner formed a partnership to own and operate discount department stores. In 1964, petitioner bought out his partner, and petitioner incorporated the business into three separate corporations: Penn-Daniels Supply Co., Jacks of Jacksonville, and Jacks of Iowa. In early 1982, petitioner was nearing retirement and decided to reorganize his three wholly owned corporations in such a way as to permit him to take a less active part in the management of the corporations and of the businesses, but also to retain his investment therein and to encourage continued ownership of the businesses by members of his family. To achieve these *602 objectives, petitioner decided to merge his three corporations into one newly formed corporation (Penn-Daniels) with the common stock of the newly formed corporation owned by petitioners' children and the voting preferred stock of the newly formed corporation owned by petitioner. The merger of the three corporations into Penn-Daniels and the exchange by petitioner of Penn-Daniels common stock for Penn-Daniels preferred stock were to constitute a tax-free reorganization and recapitalization under section 368(a)(1)(E). The reorganization and the exchange by petitioner of Penn-Daniels common stock for preferred stock, and petitioner's gift of the remaining Penn-Daniels common stock to his children were contingent upon the receipt from respondent of a favorable private letter ruling on various Federal income tax consequences of the proposed reorganization. Petitioner hired Robinson-Humphrey/American Express, Inc. (Robinson-Humphrey), to perform an independent appraisal of the value of the Penn-Daniels common and preferred stock before and after the exchange of such stock between petitioner and Penn-Daniels. On January 19, 1982, Penn-Daniels was incorporated in Delaware. Petitioner *603 received and was the owner of all 2,850 shares of newly issued Penn-Daniels common stock. Penn-Daniels was authorized to issue preferred stock, but, as described below, none was issued until July 30, 1982. At the time of incorporation of Penn-Daniels and throughout the years at issue, petitioners and their son, William D. Daniels, constituted the board of directors of Penn-Daniels. On February 1, 1982, consistent with the above reorganization plan, the proposed merger was consummated. Petitioner's three wholly owned corporations were merged into Penn-Daniels. On March 9, 1982, consistent with the above reorganization plan, Penn-Daniels formally adopted a plan for the issuance of 99,317 shares of preferred stock and for the exchange by petitioner of 2,565 shares of Penn-Daniels common stock for all 99,317 shares of Penn-Daniels preferred stock and for the gift by petitioner of the remaining 285 shares of Penn-Daniels common stock to petitioners' children, contingent on receipt of an acceptable appraisal report from Robinson-Humphrey and on receipt of a ruling from respondent that the reorganization and recapitalization of the corporations constituted a tax-free reorganization *604 and recapitalization. The 99,317 shares of Penn-Daniels preferred stock (that was to be received by petitioner in exchange for 2,565 shares of his Penn-Daniels common stock) was to constitute $ 100 par value voting stock. The right to vote the preferred stock was to lapse at the death of the last to die of petitioner and petitioner's wife. The preferred stock was to provide for an annual 16-percent noncumulative preferential dividend if declared by the board of directors of Penn-Daniels. In the event of a liquidation of Penn-Daniels at any time prior to the expiration of the sixth year after the date of original issue, the preferred stock was to have a liquidation price of $ 110 per share in preference to and in priority over any distribution to holders of the common stock. At the end of the sixth year after issuance, this liquidation preference was to be reduced $ 2 per year until the liquidation preference reached $ 100 per share. After expiration of the fifth year after issuance, the Penn-Daniels preferred stock was to be redeemable at Penn-Daniels' election for $ 110 per share. The redemption price was to be reduced by $ 2 per share each year thereafter but could not be *605 reduced below $ 100 per share. On March 26, 1982, Penn-Daniels applied for the referred-to private letter ruling from respondent. In the ruling request, all of the pertinent facts were disclosed by Penn-Daniels to respondent regarding the reorganization and merger of petitioner's three corporations into Penn-Daniels, the recapitalization of Penn-Daniels, the exchange by petitioner of 2,565 shares of Penn-Daniels common stock for Penn-Daniels preferred stock, and the simultaneous gift of the remaining 285 shares of Penn-Daniels common stock by petitioner to petitioners' children as an integral part of the overall reorganization and recapitalization. On July 14, 1982, respondent issued to Penn-Daniels a private letter ruling (the Ruling) concluding that for Federal income tax purposes the reorganization would qualify as a tax-free recapitalization under section 368(a)(1)(E) and that the exchange by petitioner of 2,565 shares of Penn-Daniels common stock for 99,317 shares of Penn-Daniels preferred stock would not be treated as a dividend under section 305(b) and (c). With respect to the value of the common stock and the preferred stock, the Ruling explained: The above rulings are *606 effective to the extent that the fair market value of * * * [Penn-Daniels] preferred stock to be received by * * * [petitioner] is approximately equal to the fair market value of the * * * [Penn-Daniels] common stock surrendered in exchange therefor. No opinion is expressed concerning the treatment of the amount, if any, by which the fair market value of the stock received exceeds, or is less than, the fair market value of the stock surrendered. A determination of the respective fair market values of the stock in question is specifically reserved until the Federal income tax returns of the taxpayers involved have been filed for the year in which the transaction is consummated.
Respondent also stated in the Ruling that respondent reserved ruling on the Federal gift tax consequences relating to petitioner's gift of the remaining 285 shares of Penn-Daniels common stock to his children. On July 30, 1982, Robinson-Humphrey issued its valuation report in which it was concluded that, as of June 30, 1982: (1) the total fair market value of Penn-Daniels was $ 11,035,000, or $ 3,872 per share of common stock, [1] and that, based on that per-share value, the fair market value of the 2,565 *607 shares of Penn-Daniels common stock that petitioner would be exchanging for Penn-Daniels preferred stock was $ 9,931,700 [2] and that the 99,317 shares of Penn-Daniels preferred stock that petitioner would receive in the exchange had a fair market value, at $ 100 per share, of $ 9,931,700. [3]
It was also concluded in the Robinson-Humphrey valuation report that the liquidation value of the 285 shares of Penn-Daniels common stock that petitioner gave to his three children was $ 110,130 or $ 386 a share, [4] and that the liquidation value of the common stock represented the fair market value of the 285 shares of common stock after the reorganization. *608 On July 30, 1982, petitioners and their children met with their lawyers and simultaneously implemented the remaining steps of the plan of reorganization of the ownership of Penn-Daniels, as follows: (1) Petitioner transferred 285 shares of Penn-Daniels common stock to his children (95 shares to each of the three children); (2) the board of directors of Penn-Daniels declared the reorganization fully effective and offered each stockholder the opportunity to exchange his or her Penn-Daniels common stock for Penn-Daniels preferred stock; and (3) petitioner exchanged all of his remaining 2,565 shares of Penn-Daniels common stock for all 99,317 shares of Penn-Daniels preferred stock. Pursuant to agreements with the children prior to the reorganization, petitioner was the only stockholder to accept the offer to exchange common stock for preferred stock. After these transactions, by virtue of the voting power associated with the preferred stock, petitioner remained the majority voting stockholder of Penn-Daniels. During the years at issue, and consistent with Penn-Daniels' policy regarding expansion, competition, and debt avoidance, no preferred or common stock dividends were declared *609 or paid by Penn-Daniels. Penn-Daniels retained all profits for use as working capital -- specifically, to build new stores, to renovate and maintain older stores, and to renovate and maintain the Penn-Daniels Distribution Center and Corporate Headquarters. On March 9, 1983, petitioners each timely filed for 1982 a Federal gift tax return that reflected the gifts of 285 shares of Penn-Daniels common stock to their children in the total amount of $ 110,110. The reported fair market value of the gifts was based on the liquidation value of the 285 shares of Penn-Daniels common stock that was transferred by petitioner to the children as reflected in the Robinson-Humphrey valuation report. The gifts of the 285 shares of Penn-Daniels common stock were described on petitioners' gift tax returns as being part of the reorganization of Penn-Daniels. Penn-Daniels timely filed a corporate Federal income tax return (Form 1120) for its taxable year ending January 31, 1983, and there was attached to the corporate return a copy of respondent's Ruling that had been received by Penn-Daniels relating to the reorganization. Respondent never audited Penn-Daniels for its 1982 taxable year with regard *610 to Penn-Daniels' Federal income tax liability, the year of the above-described corporate reorganization and the year with respect to which respondent had issued the Ruling. In March of 1988, respondent began an audit of Penn-Daniels' Federal income tax liabilities for its taxable years ending January 31, 1985, 1986, and 1987, and thereafter respondent also began an audit of petitioners' Federal gift tax liabilities for 1982, 1983, 1984, and 1985. On February 8, 1989, respondent received a valuation report from an appraiser regarding the value of Penn-Daniels common and preferred stock as of July 30, 1982. This report, referred to as the Reiss Report, valued petitioner's gifts of 285 shares of Penn-Daniels common stock, before discounts, at $ 1,103,500, or $ 3,872 per share. The Reiss Report then applied a discount of 35 percent for minority interests and lack of marketability and concluded that the value of the common stock that petitioner gave to his children had a total fair market value of $ 717,288 or $ 2,516.80 per share. The Reiss Report explained that in valuing the common stock it ignored the Penn-Daniels voting preferred stock that was issued to petitioner essentially *611 simultaneously with receipt by the children of the common stock because in the Reiss Report it was concluded that the Penn-Daniels common stock was given to the children "immediately prior" to petitioner's receipt of the Penn-Daniels preferred stock. The Reiss Report also explained that if the fair market value of the 285 shares of Penn-Daniels common stock that was given to petitioners' children is to be valued as of July 30, 1982, after the children had received the common stock and after petitioner had received for his common stock the Penn-Daniels preferred stock, then the correct valuation methodology would be that reflected in the Robinson-Humphrey valuation report. The Reiss Report also concluded that after issuance of the common and preferred stock, the value of the 2,565 shares of Penn-Daniels common stock that petitioner exchanged for shares of Penn-Daniels preferred stock was $ 3,872 per share or $ 9,931,680 and that the value of the 99,317 shares of Penn-Daniels preferred stock that petitioner received was between $ 8,180,000 to $ 9,213,000. With regard to the payment of dividends by Penn-Daniels and the negative effect such dividend payments would have had on the ability *612 of Penn-Daniels to carry out the capital improvements and business expansion that occurred during the relevant years, the Reiss Report stated the following: If Penn-Daniels had been paying dividends of almost $ 1,600,000 per year, it would not have been able to add new stores at the actual rate. Furthermore, Penn-Daniels may not have been able to purchase facilities and would not have been able to grow at its historical rate. * * * The payment of such dividends would have prevented Penn-Daniels from growing at the actual rate, and would have reduced earnings from the actual levels due to reduced sales and higher interest costs.
On March 13, 1989, and in subsequent years, at respondent's request, petitioners signed five consents -- the last to expire on April 15, 1992 -- to extend the statute of limitations on assessment of Federal gift tax for 1982 contingent upon the applicability of the section 6501(e)(2) 6-year period of limitation on assessment of gift tax. On or about May 8, 1989, petitioners filed "protective" Federal gift tax returns for each of the calendar years 1983, 1984, and 1985. Petitioners had already timely filed Federal gift tax returns for 1986. On April *613 13, 1992, just prior to the April 15, 1992, scheduled termination of the conditionally extended period of limitation on assessment, respondent issued notices of deficiency to petitioners in which respondent determined the gift tax deficiencies at issue in this case for 1982. In the notices of deficiency, respondent determined: (1) For 1982, the value of petitioner's gift of 285 shares of common stock to his children should be increased from $ 110,010, as reported by petitioners, to $ 717,288; (2) also for 1982, petitioner's exchange of the 2,565 shares of Penn-Daniels common stock for 99,317 shares of Penn-Daniels preferred stock effectively created a second taxable gift of "value" in the amount of $ 1,751,680 [5] to petitioner's children (because the value of the common stock petitioner exchanged was allegedly $ 1,751,680 more than the value of the preferred stock petitioner received thereby increasing by the alleged difference the value of the remaining common stock held by petitioners' children); and (3) for each of the years 1983 through 1986, petitioner made taxable gifts of "value" to his children, as holders of the Penn-Daniels common stock, in the amount of $ 1,589,072 for *614 each year, representing the amount of dividends that were not declared by Penn-Daniels' board of directors and that were not paid to petitioner as dividends on his preferred stock in each year, thereby allegedly increasing in each year by that amount the value of the remaining common stock held by petitioners' children and allegedly giving rise to taxable gifts in that amount from petitioner to his children. [6]
*615 The chart below illustrates the amount of the taxable gifts of "value" that respondent has charged to petitioner for 1983 through 1986 as a result of respondent's determination with regard to the failure of Penn-Daniels to declare and pay dividends to petitioner on the preferred stock: Amount of Alleged Gift of Value Re: Failure of Penn- Year
Daniels to Declare and Pay Dividends on Preferred Stock
1983
$ 1,589,072 ($ 100 par value x 99,317 shares x 16%)
1984
1,589,072 ($ 100 par value x 99,317 shares x 16%)
1985
1,589,072 ($ 100 par value x 99,317 shares x 16%)
1986
1,589,072 ($ 100 par value x 99,317 shares x 16%)
Total
$ 6,356,288
For 1982, the timeliness of respondent's two gift tax adjustments is premised on the contention that because the $ 1,751,680 gift of "value" that allegedly occurred in 1982 was not reported on petitioners' individual Federal gift tax returns, gifts in excess of 25 percent of the gifts that were reported on the returns were omitted from the returns, and the 6-year period of limitation under section 6501(e)(2) therefore is applicable, making each of the consents signed by petitioners for 1982 valid extensions of the period of limitation. *616 In their motion for summary judgment, petitioners challenge all determinations made by respondent, and petitioners argue that, for 1982: (1) Respondent's adjustments constitute simply an attempt by respondent to revalue the gift of the Penn-Daniels common stock that petitioner made to his children; (2) petitioner's gift of Penn-Daniels common stock was not omitted from petitioners' 1982 gift tax returns; and (3) the 6-year period of limitation under section 6501(e)(2) is not applicable, and respondent's deficiency determinations for 1982 are therefore barred by the 3-year period of limitation under section 6501(a). For 1983 through 1986, petitioners argue that, as a matter of law and based on the undisputed facts, corroborated by the evidence submitted in conjunction with their motion for summary judgment and not rebutted in any meaningful way by respondent, the failure of petitioner to utilize his voting power as majority stockholder to force the board of directors to declare and to pay dividends on the preferred stock does not give rise to a constructive gift by petitioner to the holders of the common stock. 1982 Statute of Limitations Issue
Under section 6501(a), the *617 general period of limitation that limits respondent's authority to make deficiency determinations is 3 years from the later of the filing of the taxpayer's tax return or the due date of the return. In March of 1983, petitioners timely filed their Federal gift tax returns, and the general 3-year period of limitation on assessment therefore expired on April 15, 1986. When respondent, in 1988, began the audit of petitioners' 1982 gift tax returns, the 3-year limitation period had already expired, and petitioners' various extensions of the period of limitation on assessment for 1982 are only effective if petitioners omitted from their Federal gift tax returns, and failed to otherwise disclose on their returns, gifts that constitute omissions of more than 25 percent of the gifts that were reported on the returns. The relevant portion of section 6501(e)(2) provides as follows: In the case of a return * * * of gift tax * * * if the taxpayer omits from the * * * total amount of the gifts made during the period for which the return was filed items includible in * * * such total gifts * * * as exceed in amount 25 percent of the * * * total amount of gifts stated in the return, the tax *618 may be assessed * * * at any time within 6 years after the return was filed. In determining the items omitted from the * * * total gifts, there shall not be taken into account any item which is omitted from the * * * total gifts stated in the return if such item is disclosed in the return * * * in a manner adequate to apprise the Secretary of the nature and amount of such item.
The gift tax regulations under section 6501(e)(2) state further and explicitly that mere increases by respondent in the valuation of assets do not constitute omissions from the taxpayer's gift tax returns, as follows -- there shall not be taken into account in computing the 25 percent omission * * * from the total gifts stated in the gift tax return, any increases in the valuation of assets disclosed on the return. [Sec. 301.6501(e)-1(b)(2), Proced. & Admin. Regs.]
Clearly, petitioner's gift of 285 shares of Penn-Daniels common stock was disclosed on petitioners' Federal gift tax returns as those returns were filed for 1982. Indeed, that gift was the very subject matter of those returns, and respondent's effort to now directly increase the value of that gift is not covered by the 6-year period *619 of limitation. Respondent does not contend otherwise. Respondent, however, contends that the alleged gift of "value" (namely, the alleged increase in the value of the children's common stock as a result of the alleged $ 1,751,680 difference between the fair market value of the common stock petitioner exchanged for the preferred stock petitioner received) constitutes a separate and distinct gift (i.e., separate from the gift of the common stock itself) that was not disclosed on petitioners' 1982 Federal gift tax returns and that respondent's adjustment with regard to this gift of "value" does not constitute a mere increase in the value of the gift of the common stock. Respondent then contends that the amount of this omitted gift constitutes more than 25 percent of the total gifts that were reported on petitioners' gift tax returns, and therefore that the 6-year period of limitation on assessment is applicable, and petitioners' consents extending the statute of limitations are applicable as to both the alleged $ 1,751,680 gift of "value" and also as to the $ 717,288 alleged increase in the value of the gift of the common stock. Petitioners respond that, in fact and substance, respondent's *620 alleged gift of "value" simply constitutes a determination by respondent that petitioner's gift of Penn-Daniels common stock should be increased in value, and that there was no second, separate, and distinct gift apart from the gift of the 285 shares of Penn-Daniels common stock. Petitioners, therefore, argue that regardless of the merit or lack of merit in respondent's revaluation of the gift, because a mere increase by respondent in the value of a reported gift does not constitute an "omitted item" under section 6501(e)(2), respondent's proposed adjustments for 1982 are barred by the 3-year period of limitation. Alternatively, relying on section 301.6501(e)-1(b)(2), Proced. & Admin. Regs., petitioners argue that if we should conclude that the alleged gift of "value" does constitute a separate and distinct gift, the value of which was not reported on petitioners' 1982 gift tax returns, the fact of such a gift was disclosed on petitioners' returns, and the 6-year period of limitation would not be applicable because of such disclosure. Because we agree with petitioners on their first argument, we need not address petitioners' second argument. Regarding petitioners' motion for summary *621 judgment, respondent agrees that, if we find that there was no second gift of "value" made to petitioners' children, the period of limitation applicable to assessment is closed to respondent, and petitioners' motion for summary judgment on this issue should be granted. In analyzing the transaction before us, it is appropriate to discuss briefly the step-transaction doctrine. As was stated in Kanawha Gas & Utils. Co. v. Commissioner, 214 F.2d 685, 691 (5th Cir. 1954), revg. 19 T.C. 1017 (1953): In determining the incidence of taxation, we must look through form and search out the substance of a transaction. This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated. * * * [Emphasis added; citations omitted.]
See also Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 658 (5th Cir. 1968). *622 In Commissioner v. Clark, 489 U.S. 726, 738 (1989), it was stated -- [Under] the well-established "step-transaction" doctrine * * * that we have expressly sanctioned. * * * interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction." [Citations omitted.]
Courts use different theories to analyze the substance of a transaction and particularly to apply the step-transaction doctrine. One theory focuses on whether "a reasonable interpretation of objective facts [indicates that] the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Redding v. Commissioner, 630 F.2d 1169, 1177 (7th Cir. 1980) (quoting Paul & Zimet, Step Transactions, Selected Studies in Federal Taxation 200, 254 (2d Series)), revg. and remanding 71 T.C. 597 (1979); *623 see also King Enters., Inc. v. United States, 189 Ct. Cl. 466, 418 F.2d 511, 516 (1969); American Wire Fabrics Corp. v. Commissioner, 16 T.C. 607, 614 (1951). Another theory is that the steps of a transaction should be collapsed into one taxable event if a "series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result." Penrod v. Commissioner, 88 T.C. 1415, 1429 (1987). Generally, under the step-transaction doctrine, the sequence of events which occur is irrelevant as long as such events are "clearly part of an overall plan," and any tax computations should be made after the entire transaction is completed. Rev. Rul. 75-447, 1975-2 C.B. 113, 114; see also Zenz v. Quinlivan, 213 F.2d 914, 917 (6th Cir. 1954). Regardless of which theory is used under the step-transaction doctrine, the facts before us lead to the same conclusion. The transaction that respondent seeks to treat as giving rise to two separate gifts constituted *624 only one gift to each of petitioners' children. There was a single plan of corporate reorganization and recapitalization intended to create, simultaneously, a single specific outcome regardless of the sequence of the steps. Accomplishing only one of the steps in the reorganization would not have effected the change in control sought by the various participants to the reorganization. The undisputed record shows that only petitioner was to exchange Penn-Daniels common stock for preferred stock and that exchange, effectively, was to occur simultaneously with petitioner's gift of the remaining 285 shares of Penn-Daniels common stock to his children. The evidence is clear that no one step would have been taken except in contemplation of the other steps. We agree with petitioners that the relevant steps before us constitute one gift by petitioner to his children of Penn-Daniels common stock. We would be exalting form over substance if we were to conclude that petitioner made one direct gift of the common stock and another gift of the alleged increase in "value" of that common stock as a result of some difference in the value of the common stock petitioner exchanged for the preferred *625 stock he received. If respondent is correct in her valuation of the common and preferred stock of Penn-Daniels, that increase simply would cause an increase in the valuation of the 285 shares of common stock that petitioner gave to his children. It appears that respondent is making this second gift of "value" argument because respondent failed to increase the value of petitioner's gift of common stock to petitioners' children within the 3-year limitation period on the assessment of tax under section 6501(a). Respondent's argument that there was a second distinct gift undisclosed on petitioners' gift tax returns, therefore triggering the 6-year statute of limitations, in fact is nothing more than a belated effort to revalue petitioner's gift of the common stock to petitioners' children. Respondent, relying heavily on Kincaid v. United States, 682 F.2d 1220, 1224 (5th Cir. 1982), asserts that if a shareholder transfers property to a corporation for less than adequate consideration, then that shareholder is generally considered to have made a gift of value to the other shareholders of the corporation. Petitioner in this case, however, readily acknowledges *626 that he made a gift to his children measured by the fair market value of the equity interests in Penn-Daniels that they were given, which equity interests were represented by the 285 shares of common stock that the children were given. The question before us and not before the court in Kincaid is whether petitioner made a gift of "value" to his children, separate and distinct from the gift of the equity interests in Penn-Daniels represented by the common stock. Kincaid did not involve that question, and Kincaid provides no support for respondent's position on the issue before us. CTUW Georgia Ketteman Trust v. Commissioner, 86 T.C. 91 (1986), is distinguishable on the same grounds. Each of petitioners' children was given an equity interest in Penn-Daniels. If petitioner received insufficient consideration for the 2,565 shares of Penn-Daniels common stock that he exchanged for the 99,317 shares of Penn-Daniels preferred stock that he received, that difference in consideration may well have increased the value and amount of the equity interests (represented by the 285 shares of common stock) that petitioner gave to the children, but that *627 difference certainly does not give rise to a separate and distinct taxable gift. That difference would only affect and increase the value of the equity interests (i.e., of the common stock) that petitioner gave to the children. We recognize, and petitioners do not contend otherwise, that the transaction before us constituted an intra-family transfer requiring special scrutiny. Fehrs v. United States, 223 Ct. Cl. 488, 620 F.2d 255, 260 (1980). For purposes of the instant issue, however, the point to focus on is not the alleged difference in value between the common and preferred stock that petitioner exchanged. We assume such difference existed. A gift clearly was made in this case by petitioner to his children. Petitioners have always acknowledged that gift, and petitioners timely filed Federal gift tax returns reporting that gift. Taking into account the alleged difference in value between the common and preferred stock that petitioner exchanged, the value and amount of the gift that was reported by petitioners would and should have been larger. Again, petitioners do not contend otherwise. That fact, however, would only establish *628 that a larger gift was made, not that an additional gift was made. As explained, the undisputed facts before the Court indicate that, on July 30, 1982, there was no second, distinct gift of "value" or equity in Penn-Daniels made by petitioner to his children. As such, the 6-year limitation period on the assessment of tax available under section 6501(e)(2) is not available to respondent. Because we find in favor of petitioners on this issue, we need not discuss petitioners' alternative argument regarding disclosure. We emphasize that our conclusion herein should not be interpreted as an acceptance of petitioners' valuation of the common and preferred stock as of the date of the recapitalization and gift to petitioners' children. That valuation question, however, as discussed, is now barred by the 3-year period of limitation. In other cases, in similar situations, respondent is free to raise all valuation adjustments that are determined to be appropriate, but respondent must do so in a timely manner. Based on the above analysis, we shall grant petitioners' motion for summary judgment on the 1982 statute of limitations issue. Foregone Dividend Issue
With regard to the *629 foregone dividend issue, applicable to 1983 through 1986, petitioners' motion for summary judgment is based on the premise that, considering the applicable law and the facts established in connection with their motion for summary judgment, the failure of Penn-Daniels' board of directors to declare and the failure of Penn-Daniels to pay dividends on the Penn-Daniels preferred stock that was owned by petitioner do not give rise to taxable gifts by petitioner to holders of the common stock. Petitioners have submitted substantial evidentiary material in support of their motion for summary judgment on this issue, and petitioners assert that there remain no disputed genuine and material issues of fact and that we should grant their motion for summary judgment on this issue. Respondent opposes petitioners' motion for summary judgment on this issue. Respondent argues that there remain disputed issues of fact, and respondent contends that petitioners' interpretation of Delaware law as it pertains to the rights and responsibilities of majority stockholders is erroneous. Before addressing the substantive issue, it is necessary and appropriate to discuss the applicable law that pertains to *630 summary judgment procedure, particularly in light of recent Supreme Court and other court cases that have viewed summary judgment procedure more favorably than in the past and that have encouraged greater use of this procedure in order to facilitate efficient judicial administration. The law of summary judgment under Rule 121 corresponds to rule 56 of the Federal Rules of Civil Procedure, and cases involving rule 56 of the Federal Rules of Civil Procedure are relevant in the Tax Court. [7]Klein v. Commissioner, 899 F.2d 1149, 1151 (11th Cir. 1990); Abramo v. Commissioner, 78 T.C. 154, 162 n.8 (1982). *631 "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). "Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials of phantom factual questions." Kroh v. Commissioner, 98 T.C. 383, 390 (1992); see also McIlvane v. Commissioner, T.C. Memo. 1994-104. One of the principal purposes of a summary judgment is "to isolate and dispose of factually unsupported claims * * * and we think it should be interpreted in a way that allows it to accomplish that purpose." Prabel v. Commissioner, 91 T.C. 1101, 1120 (1988), affd. 882 F.2d 820 (3d Cir. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. at 323-324). On summary judgment, the moving party "bears the initial responsibility of informing [the Court] *632 of the basis for its motion, and identifying those portions of 'the pleadings * * * admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Whetstine v. Gates Rubber Co., 895 F.2d 388, 392 (7th Cir. 1990); Krause v. Commissioner, 92 T.C. 1003, 1016 (1989), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). The moving party may, however, discharge that burden by showing that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. at 325. Where the moving party does so, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the [opposing] party's case necessarily renders all other facts immaterial." Id. at 323. The facts relied upon by the moving *633 party must be viewed by the Court in the light most favorable to the opposing party. Adickes v. S.H. Kress & Co., supra at 157. However, a motion for summary judgment should be granted if the Court is satisfied that no real factual controversy exists so that the remedy of summary judgment can serve "its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried." Lyons v. Board of Educ., 523 F.2d 340, 347 (8th Cir. 1975). The opposing party is not required to negate the moving party's claims but is required to show specific facts exhibiting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. at 323-324. "Where the [opposing] party has presented evidence to support the essential elements of its claims but that 'evidence is merely colorable, or is not significantly probative, summary judgment may be granted [in favor of the moving party]." Hibernia Natl. Bank v. Carner, 997 F.2d 94, 98 (5th Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 249-250 (1986)). *634 Summary assertions and conclusory allegations are simply not enough evidence to raise a genuine issue of material fact. See Lechuga v. Southern Pac. Transp. Co., 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence"). Also, "it is insufficient for the [opposing party] to argue in the abstract that the legal theory involved in the case encompasses factual questions." Hibernia Natl. Bank v. Commissioner, supra at 98 (citing Pennington v. Vistron Corp., 876 F.2d 414, 426 (5th Cir. 1989). In United States v. Byrum, 408 U.S. 125 (1972), the Supreme Court, among other things and in the context of the Federal estate tax, discussed generally the right of majority shareholders in small corporations to utilize their voting power to require the payment of dividends, as follows: There is no reason to suppose that the three corporations controlled by Byrum were other than typical small businesses. The customary vicissitudes of such enterprises -- bad years; product obsolescence; new competition; disastrous *635 litigation; new, inhibiting Government regulations; even bankruptcy -- prevent any certainty or predictability as to earnings or dividends. There is no assurance that a small corporation will have a flow of net earnings or that income earned will in fact be available for dividends. Thus, Byrum's alleged de facto 'power to control the flow of dividends' * * * was subject to business and economic variables over which he had little or no control. * * * Directors of a closely held, small corporation must bear in mind the relatively limited access of such an enterprise to capital markets. This may require a more conservative policy with respect to dividends than would [be] expected of an established corporation with securities listed on national exchanges. Id. at 139-140. [8]
*636 In Chambers v. Commissioner, 87 T.C. 225, 231-232 (1986), we applied the above observations from United States v. Byrum, supra, in the Federal gift tax context, and we explained that the business and economic vicissitudes of corporate existence and capital needs have a significant impact on the determination of a corporation's dividend policy. In Snyder v. Commissioner, 93 T.C. 529, 546 (1989), we commented on the basic nature of the equity interest of a stockholder in a corporation and the inability, generally, of a stockholder to demand the payment of dividends, as follows -- an equity interest in a corporation ordinarily gives no certain right to be paid for use of the capital contributed in exchange for the [equity] interest. * * * the corporation that issued the stock does not have to pay for the use of the property contributed. If payment is made (i.e., dividends), it is discretionary with the corporations's board of directors. * * * [Snyder v. Commissioner, 93 T.C. at 546.]
In Hutchens Non-Marital Trust v. Commissioner, T.C. Memo. 1993-600, *637 the husband and wife taxpayers held voting preferred stock that had a conditional right to fixed-rate dividends payable only if the board of directors, of which the taxpayers were members, voted for the dividends. No dividends were declared, and respondent asserted that these "foregone dividends" constituted taxable gifts by the holders of the preferred stock to the common stockholders, the taxpayers' children. We held that under United States v. Byrum, supra, the taxpayers had a fiduciary duty not to act in their own interests at the expense of the corporation and that because valid business reasons accounted for the corporation's nonpayment of dividends, such unpaid dividends did not constitute gifts of value to the other stockholders. Under Delaware law, corporate directors and shareholders generally are required to put the interests of the corporation before their personal interests as shareholders. See United States v. Byrum, supra at 137-138; Getty Oil Co. v. Skelly Oil Co., 267 A.2d 883, 886 (Del. 1970); Freedman v. Restaurant Associates Indus., Inc., Civil Action No. *638 9212, slip op. at 19 (Del. Ch. 1990) (reported at Fed. Sec. L. Rep. (CCH) P95,617). "A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose," Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971), affd. 332 A.2d 139 (Del. 1975). Absent some showing of abuse of discretion or evidence that the board of directors failed to select a reasonable course of action, a court will not substitute its own judgment of what is or is not sound business judgment. See Paramount Communications, Inc. v. QVC Network, 637 A.2d 34, 45-46 (Del. 1994); Gabelli & Co., Inc. v. Liggett Group, Inc., 479 A.2d 276, 280 (Del. 1984); Rome v. Archer, 197 A.2d 49, 54 (Del. 1964). On the record before us, we conclude that petitioners, as the moving party, have established the relevant and material facts and law and their entitlement to summary judgment in their favor. Petitioners offer an affidavit signed by an officer *639 of Penn-Daniels (not petitioner), who explained on behalf of the corporation that: During the years 1982 through 1986, Penn-Daniels did not pay any dividends because it needed to expand (larger inventory, new locations, etc.) to stay competitive in the market, it needed to preserve its working capital for that expansion, and it did not want to deviate from the longstanding policy and practice of Penn-Daniels not to take on debt. That expansion did occur and consumed Penn-Daniels working capital. The IRS has never found that Penn-Daniels had any accumulated earnings tax liability.
Further, petitioners offer the Robinson-Humphrey appraisal, wherein the appraiser concluded that -- [Penn-Daniels] will need any additional capital that it generates internally to fund its growth, particularly in light of * * * [Penn-Daniels'] low leverage posture. Based on the foregoing, we believe it prudent to assume that * * * [Penn-Daniels] has no dividend paying capacity at this time [1982].
Significantly, as set forth earlier herein, in the Reiss Report respondent's own appraiser acknowledged that, although Penn-Daniels may have had some ability to pay dividends during the years *640 at issue, had it done so its ability to fund business expansion that occurred would have been impaired. The Reiss Report contained the following statement: If Penn-Daniels had been paying dividends of almost $ 1,600,000 per year, it would not have been able to add new stores at the actual rate. Furthermore, Penn-Daniels may not have been able to purchase facilities and would not have been able to grow at its historical rate. * * * The payment of such dividends would have prevented Penn-Daniels from growing at the actual rate, and would have reduced earnings from the actual levels due to reduced sales and higher interest costs.
In the Reiss Report, the appraiser itemized the funds Penn-Daniels spent throughout the years at issue on business activities and expansion, which included expanding Penn-Daniels inventory, opening new stores in new locations, renovating old stores, and maintaining corporate facilities such as the Distribution Center and Corporate Headquarters. The primary alleged facts that respondent offers to show the existence of a genuine issue for trial stem from an affidavit signed by respondent's counsel. In the affidavit, respondent's counsel simply reiterates *641 Penn-Daniels' net income and accumulated earnings throughout the years at issue, and respondent's counsel then alleges in a conclusory manner that -- respondent will, if this case comes to trial, offer expert testimony that, based upon an analysis of financial information, Penn-Daniels could have paid dividends on the preferred stock owned by [petitioner] and still met its requirements for working capital.
The allegations respondent offers constitute insufficient proof regarding the essential elements of respondent's objection to petitioners' motion for summary judgment on this issue. Celotex Corp. v. Catrett, 477 U.S. at 323. Respondent's counsel's conclusory disagreement with verified material, set forth both in petitioners' motion for summary judgment and also in the report of respondent's own expert, does not satisfy the requirement of Rule 121(d) that respondent must set forth "specific facts showing that there is a genuine issue for trial." However, assuming arguendo, that respondent's allegation is accurate, that Penn-Daniels had funds to pay out dividends on a yearly basis, such determination is not dispositive of the issue raised *642 in petitioners' motion. The issue for trial would not be whether Penn-Daniels had the ability to pay dividends, but rather whether petitioner and the other directors of Penn-Daniels had valid business reasons for not voting to pay dividends. Based on the evidence presented, petitioners have demonstrated that such business reasons existed, and respondent has offered no meaningful evidence to the contrary. Respondent makes only speculative statements to support her argument that genuine issues of material fact exist. [9] Such evidence is not sufficient to deny a motion for summary judgment. Hibernia Natl. Bank v. Carner, 997 F.2d 94 (5th Cir. 1993); Lechuga v. Southern Pac. Transp. Co., 949 F.2d 790 (5th Cir. 1992). Petitioners, by contrast, show that, because of actual business needs and objectives of the corporation, the directors chose not to pay out dividends. Penn-Daniels chose to use profits to expand, to compete, and to maintain corporate financial integrity. The facts in respondent's own Reiss Report corroborate these facts. Penn-Daniels did expand, did use funds for substantial renovations, and was able to *643 minimize its accumulation of debt in the process. Relying on Burton v. Exxon Corp., 583 F.Supp. 405 (S.D.N.Y. 1984), respondent argues that petitioner had a "right" to demand payment of dividends on his preferred stock because petitioner, as majority stockholder, theoretically had the ability to elect directors who would have declared dividends. Respondent argues, therefore, that petitioner's failure to exercise his "right" constitutes a purposeful foregoing of dividend payments resulting in gifts of value to petitioners' children, the other shareholders in *644 the corporation. Respondent ignores the fact that petitioner's "right" to dividends was actually conditioned on the directors' vote to pay the dividends. A conditional right such as that held by petitioner does not correspond to the kind of "right" to demand payment that respondent cites under Delaware law. Under United States v. Byrum, 408 U.S. 125 (1972), petitioner had no legally enforceable right to dividends in the sense contemplated by cases like Burton v. Exxon Corp., supra, and Bershad v. Curtiss-Wright Corp., 535 A.2d 840 (Del. 1987). Respondent's speculation that petitioner could have elected directors to Penn-Daniels' board, who necessarily and inevitably would have voted to pay dividends on the preferred stock, does not rise to the level of evidence required, in the context of a motion for summary judgment, to establish the existence of a genuine and material issue of fact, particularly in the face of the undisputed need for capital to support business expansion contemplated by Penn-Daniels and in the face of Penn-Daniels' undisputed policy of minimizing debt. On the basis *645 of the uncontested facts before us on petitioners' motion for summary judgment, we conclude that the failure of Penn-Daniels to pay dividends to petitioner is not to be regarded as a gift to the common stockholders. Respondent advances merely speculative suggestions, and respondent makes mere conclusory assertions that do not impede our ability to enter summary judgment in this case. Celotex Corp. v. Catrett, 477 U.S. at 323-324. Petitioners offer objective and uncontradicted evidence establishing the validity of Penn-Daniels' stated business reasons which inhibited Penn-Daniels' directors from declaring dividends, evidence which is corroborated by Penn-Daniels' actual business expansion in subsequent years. Respondent has failed to establish any genuine issue of fact that warrants a trial. We shall grant petitioners' motion for summary judgment on the foregone dividends issue. An appropriate order and decision will be entered. Footnotes
1. $ 11,035,000 divided by 2,850 (the total number of shares of common stock outstanding) equals $ 3,872 per share.↩
2. 2,565 shares times $ 3,872 equals $ 9,931,680.↩
3. 99,317 shares of preferred stock times $ 100 equals $ 9,931,700.↩
4. $ 11,035,000 total value of Penn-Daniels less $ 10,924,870 liquidation value of all of Penn-Daniels preferred stock equals $ 110,130.↩
5. The $ 1,751,680 gift of "value" that respondent determined petitioner made in 1982 was calculated by respondent as the difference between the agreed $ 9,931,680 appraised value of the common stock petitioner gave up less $ 8,180,000, the figure respondent's appraiser determined represented the lowest value of the Penn-Daniels preferred stock that petitioner received for the common stock.↩
6. The 16 percent noncumulative preferred stock dividends, if declared and paid, would have resulted in annual dividends of $ 1,589,072 (16 percent times $ 9,931,700 par value of preferred stock equals $ 1,589,072).↩
7. Rule 121(d) and Fed. R. Civ. P. 56(e), are virtually identical. Rule 121 states in part: (d) Form of Affidavits; Further Testimony; Defense Required: Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or filed therewith. The Court may permit affidavits to be supplemented or opposed by answers to interrogatories, depositions, further affidavits, or other acceptable materials, to the extent that other applicable conditions in these Rules are satisfied for utilizing such procedures. When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party↩. [Emphasis added.]
8. Although sec. 2036(b) was enacted after the decision in United States v. Byrum, 408 U.S. 125 (1972), in an effort to partially reverse the holding of that case, the rationale of Byrum is, nevertheless, still valid law in the context of the present issue. Respondent recognizes that Byrum continues to be controlling on all issues decided by the Supreme Court and not specifically overruled by sec. 2036(b). See Rev. Rul. 81-15, 1981-1 C.B. 457; Priv. Ltr. Rul. 90-26-021 (March 26, 1990); Priv. Ltr. Rul. 91-31↩-006 (April 30, 1991).
9. Respondent offers no facts that show, for instance, that Penn-Daniels took out loans despite its affidavit stating a policy to the contrary. Respondent cannot expect this Court to penalize Penn-Daniels' officers for not being able to forecast the profitability of the corporation. It is noted in petitioners' reply memorandum that Penn-Daniels' competitors included Wal-Mart and K-Mart, formidable competitors, to say the least.↩